UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------  X
                                                                     :        18-cv-319-ARR-RML
R. ALEXANDER ACOSTA,                                                 :
Secretary of Labor, United States Department of Labor,               :        OPINION AND ORDER
                                                                     :
                                         Plaintiff,                  :
                                                                     :
              -against-                                              :
                                                                     X
LOCAL 101, TRANSPORT WORKERS UNION OF
AMERICA AFL-CIO,

                                         Defendant.
-------------------------------------------------------------------

ROSS, United States District Judge:

          Plaintiff, the Secretary of Labor, instituted this action under the Labor-Management

Reporting and Disclosure Act ("the LMRDA"). The lawsuit arises from a recent officer election

conducted by Local 101, Transport Workers Union of America AFL-CIO ("Local 101"). Baron

Marquis, a member of the union in good standing at the time of the election, was disqualified as

a candidate for president after he failed to timely file a letter of acceptance[1] with Local 101

confirming his nomination and intent to run. He protested his disqualification to several internal

union administrative bodies before filing a complaint with the Secretary of Labor. Following an

investigation, the Secretary of Labor brought this suit, alleging that the union's decision to

disqualify Marquis was an unreasonable application of a facially reasonable election rule. The

---

[1] Throughout this opinion and order, I refer to this form interchangeably as a letter of acceptance,
acceptance of nomination, and notice of acceptance form. *See, e.g.*, *Acceptance of Nomination* Ex. D,
ECF No. 15-2; Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Cross-Mot. for
Summ. J. 5, ECF No. 18 ("Pl.'s Mem. of Law"); Def.'s Mem. of Law in Supp. of Mot. for Summ. J. 1,
ECF No. 17 ("Def.'s Mem. of Law").

parties filed cross-motions for summary judgment with respect to whether the union's

disqualification of Marquis was the result of a "reasonable qualification uniformly imposed," 29

U.S.C. § 481(e), or whether it impermissibly restricted the candidacy pool and denied members

"democratic choice in selecting union officers," Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for

Summ. J. and in Support of Pl.'s Cross-Mot. for Summ. J. 7, ECF No. 18 ("Pl.'s Mem. of Law").

For the reasons that follow, Local 101's motion for summary judgment is GRANTED and the

Secretary of Labor's motion for summary judgment is DENIED.

## FACTUAL AND PROCEDURAL BACKGROUND

Unless otherwise noted, the following facts set forth an undisputed account of the events

leading up to and immediately following the election by acclamation held by Local 101 on

February 23, 2017.[2]

Defendant Local 101 is a local labor organization recognized by the LMRDA. *See* Stip.

of Facts ¶ 5. At the time of the election, Local 101 represented "approximately 1600 active and

retired members who were employed by three utility employers in Brooklyn and Queens." *Id.* ¶

6. Pursuant to its bylaws, Local 101 conducts officer elections every three years for the purpose

of electing a president, a vice president, a recording secretary, and a financial secretary-treasurer.

*The Official By-Laws of the Transport Workers Union Local 101, AFL-CIO*, Article II: Officers

Ex. A, ECF No. 16-3 ("Bylaws"). Constance Bradley was nearing the end of a three-year term as

the union's president in early 2017 at the time that Local 101 was preparing to conduct the

election in question. *See* Stip. of Facts ¶ 23.

### I. The 2017 Election

---

[2] *See* Def.'s Rule 56.1 Stmt., ECF No. 15-1 ("Def.'s 56.1"); Pl.'s Resp. to Def.'s Stmt. of Material
Undisputed Facts, ECF No. 16-1 ("Pl.'s 56.1 Resp."); Stip. of Facts Ex. 1, ECF No. 16-3.

After convening an election committee ("the committee") to develop governing rules for the 2017 election, Local 101 mailed a notice outlining the nomination and election process to all union members on January 10, 2017. *Id.* ¶ 8. The notice set out comprehensive instructions for members to follow if they were interested in running for one of the officer positions in the upcoming officer election, scheduled for March 23, 2017. Specifically, it provided that the "nomination period would run from February 6 through February 10, and that nominations could only be made by completing nominating petition forms provided by the union." *Id.* ¶ 9. The forms required candidates to collect the "original signatures of one hundred members in good standing" during the open nomination period, and to file their signed and completed petitions with the election committee by 6:00 p.m. on February 10, 2017. *Id.* ¶¶ 10–11. The notice stated that the committee would review all petitions and signatures to ensure compliance with the relevant rules, and would subsequently notify candidates of their eligibility to run by mailing them an "official [n]otice of [n]omination." *Id.* ¶¶ 23, 12. Further, it informed members that all candidates deemed eligible to run would be provided with a notice of acceptance form, which they would be instructed to sign and return "no later than noon on February 22, 2017." *Id.* ¶ 13 (internal quotation marks omitted); ¶¶ 24–25.

Only candidates who completed this final step—returning a signed letter formally accepting the nomination by the deadline—would be allowed to run in the election.[3] *See id.* ¶

---

[3] According to defendant, the rule requiring candidates to submit a signed letter of acceptance "has been in the Local 101 Election Rules at least since 1982, and is commonly used by Transport Workers Union locals." Def.'s 56.1 ¶ 52. Plaintiffs argue that this alleged fact is "not supported by admissible evidence," as it is based in part on inadmissible hearsay and is supported only by a declaration of defendant's attorney. *See* Pl.'s 56.1 Resp. ¶ 52. Despite the existence of this dispute, neither the historical legacy of the letter of acceptance rule nor its potential use by other unions is material to the ultimate question of whether or not it is "reasonable." As such, "the foregoing issues need not be resolved[,] as they have no

29–31. If more than one candidate returned a signed letter of acceptance for a given position, Local 101 would organize a contested election in partnership with the American Arbitration Association. *See Local 101 Transport Workers Union of America 2017 Notice of Nominations and Election, Official Election Rules* 2 Ex. B, ECF No. 16-3 ("Official Election Rules"). For the 2017 election, ballots were to be mailed to all union members in good standing at their last known address on March 1, 2017. *Id.* Return ballots completed by voting members would be accepted until 5:00 p.m. on March 22, 2017, and votes were to be counted on March 23, 2017 at 9 a.m. by "representatives of the American Arbitration Association." *Id.* If, however, only one candidate was eligible for each position, Local 101 would not mail election ballots to members and would instead conduct an uncontested election, or election by acclamation. *Id.* In that case, the chairman of the election board was to "cast one ballot for all uncontested candidates who are deemed eligible to run for office," and subsequently declare the uncontested candidates the winners of the election. *Id.*[4]

Baron Marquis first indicated his intent to run in the 2017 election on February 3. Stip. of Facts. ¶ 15. He personally visited the union office to ask for the nomination petition forms so that

---

bearing on the [c]ourt's decision." *Douglas v. Dist. Council 37 Mun. Emp.'s Educ. Fund Trust*, 207 F. Supp. 2d 282, 288 (S.D.N.Y. 2002).

[4] Though both parties stipulate to the fact that the election rules mailed to union members described the process to be used in the event of an uncontested election, plaintiffs note that neither the rules nor the bylaws gave the committee "explicit authority to [conduct the election by acclamation] prior to the date set by the Local Executive Board." Pl.'s 56.1 Resp. ¶ 14; *see also* Pl.'s 56.1 ¶¶ 53–56. In this case, the election by acclamation occurred on February 23, 2017, a month before the date the rules prescribed as the time when the ballots in a contested election would be counted. Stip. of Facts ¶¶ 31, 34. As described further in part III of the discussion section, *infra*, allegations that Local 101 violated or failed to adhere to various election rules, while troubling, are immaterial to this dispute as there are no arguments that these alleged inconsistencies may have affected the outcome of the election. Furthermore, the LMRDA does not "grant federal courts 'jurisdiction to enforce union constitutions and bylaws.'" *Conway v. Int'l Ass'n of Heat and Frost Insulators and Asbestos Workers*, No. 1:00 CV 2897, 2001 WL 1867701, at *8 (N.D. Ohio Oct. 18, 2001) (quoting *Neinaber v. Ohio Valley Carpenter's Dist. Council*, 652 F.2d 1284, 1286 (6th Cir. 1981)).

he could begin collecting the signatures he needed to run. *Id.* Though the notice mailed to all union members indicated that the nomination period would not begin running until February 6, 2017, committee member Yolanda Daniels provided Marquis with the forms he requested on February 3. *Id.* ¶ 16. However, she asked that he wait until February 6 to begin collecting signatures. *Id.* At the same time that she gave him the petition forms, Daniels erroneously handed Marquis the "[n]otice of [n]omination form, which was to be mailed to the candidates *after* the [c]ommittee reviewed the adequacy of the candidates' nominating petitions and determined the candidate's eligibility based on the number of eligible signatures collected on the petition." *Id.* ¶ 17 (emphasis added). Daniels and Marquis both signed the nomination form on February 3, before Marquis had collected any signatures supporting his candidacy. *Id.* ¶ 18.

On February 10, Marquis returned his petition—now complete with the requisite number of member signatures—to the union office. *Id.* ¶ 19. Upon receipt of his signed petition, Celeste Streeter, chair of the election committee, notified Marquis that the prior notice of nomination form that he had signed on February 3 had been completed in error, and that he would be receiving a new nomination form—along with the required letter of acceptance form—in the mail after the committee determined that his signatures were in proper form and that he was a qualified candidate. *Id.* ¶ 20. Apparently aware that the committee required all candidates to return a signed letter of acceptance form before their names could be placed on the ballot, Marquis requested "to sign the [l]etter of [a]cceptance when turning in his petition, but was told that he would have to sign the copy sent to him by [c]ertified [m]ail after his signatures were submitted and he was found qualified to run." *Id.* ¶ 33.

The committee met on February 13 to review all applications received. *Id.* ¶ 21. During that meeting, the committee determined that Marquis was eligible to run in the election. Though

he had disregarded Daniels's request that he wait until February 6 to begin collecting signatures, *see id.* ¶ 16, "[t]he [c]ommittee did not discount [the two] signatures gathered before February 6, 2017."[5] *Id.* ¶ 22. During the same February 13 meeting, the committee also reviewed the petition and signatures submitted by Constance Bradley, the incumbent president, and "determined that she was eligible to run for office." *Id.* ¶ 23. The following day, the committee mailed Marquis a new notice of nomination form (replacing the one previously provided in error by Daniels), which "inform[ed] him that he was nominated to run for the office of [p]resident in the election." *Id.* ¶ 23. In the same mailing, the committee included a blank letter of acceptance form, along with "instructions to sign and return the form to the [e]lection [c]ommittee by noon on February 22, 2017." *Id.* ¶ 24. The notice of nomination form stated clearly that all candidates must return the "enclosed form"—referring to the blank letter of acceptance—"by noon, February 22, 2017," and warned candidates not to mail the form back, as it needed to be in the office—not postmarked—by that date and time. Notice of Nomination Ex. D, ECF No. 15-2. Marquis received the forms in the mail on February 17. Stip. of Facts ¶ 26.

Incumbent candidates, including Constance Bradley, received their notice of nomination and letter of acceptance forms by hand, rather than mail, on February 16, before a general membership meeting. *Id.* ¶ 27. Bradley submitted her signed letter of acceptance in person the following day, February 17—several days before the February 22 deadline. *Id.* ¶ 28. Marquis, the only challenger who had submitted a nomination petition for any officer position, did not return the letter of acceptance form until Saturday, February 25—three days after the deadline. *Id.* ¶ 32. At that time, the union office was not open, so Marquis slid his letter under the door. *Id.* Marquis

---

[5] In the stipulated facts, both parties highlight various irregularities and deviations from the rules and bylaws that occurred in the lead-up to the election by acclamation. Part III of the discussion section, *infra* discusses these facts fully.

did not notify the committee before he submitted his letter; he did not provide an explanation for his delinquency, or communicate with the committee to seek an extension. *Id.* ¶ 29. Likewise, the committee did not communicate with Marquis after the deadline passed to ask why he had not delivered his letter, though members of the committee did confirm that Marquis had received the mailing by checking the return receipt on the package. *Id.* ¶ 30.

On February 23, one day after the deadline for the return of the acceptance forms and two days before Marquis would eventually turn in his overdue signed form, the committee declared Marquis ineligible to run in the election because of his failure to return the required form. *Id.* ¶ 31. Because Marquis's disqualification meant that all officer positions were now uncontested, the committee conducted the election by acclamation at the same meeting in which Marquis was deemed ineligible, and subsequently declared Constance Bradley and all other incumbents re-elected. *Id.* ¶ 34. Marquis learned of Bradley's election by acclamation on February 27, when Local 101 published the election results on its website. *Id.* ¶ 36.

## II. Appeals

After his disqualification, Marquis pursued several rounds of administrative appeals before exhausting his internal remedies. *See id.* ¶¶ 37–47. His appeals were not successful. *Id.* On October 25, 2017, in accordance with section 402(a)(1) of the LMRDA, Marquis filed a complaint with the Secretary of Labor. *Id.* ¶ 49. After conducting an investigation, the Secretary "found probable cause to believe that a violation of [the LMRDA] . . . had occurred in the conduct of [Local 101's] election."[6] *Id.* ¶ 50. The Secretary brought this petition on January 17, 2018, seeking a declaration that the election for president conducted the previous year is void, an

---

[6] The Stipulation of Facts states, in paragraph 50, that the election by acclamation occurred "on February 22, 2017," but other parts of the record make clear that the election occurred at the same meeting during which Marquis was declared ineligible, which took place on February 23, 2017. *See* Stip. of Facts ¶¶ 7, 31; Pl.'s Mem. of Law 5. Thus, I assume this is a typographical error.

order directing Local 101 to conduct a new election for president under the Secretary's

supervision, and costs and other appropriate relief. Compl. 5–6, Prayer for Relief, ECF No. 1.

Now, both parties' motions for summary judgment are before the court. Local 101 argues

that Marquis was disqualified because "he was incapable of following a simple rule"—a rule

which was both reasonable and uniformly imposed.[7] Def.'s Mem. of Law 11. The Secretary

argues that Marquis's disqualification was unreasonable, as it resulted from "a failure to comply

with a *pro forma* procedural requirement that was not uniformly applied" and "denied [union]

membership democratic choice in selecting union officers." Pl.'s Mem. of Law 7.

## STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). At the summary judgment stage, the court's role is not to resolve disputed issues,

but rather to determine whether a genuine issue exists that must be tried. *See Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (citing *First Nat'l Bank of Ariz. v. Cities Serv.*

*Co.*, 391 U.S. 253, 288-89 (1968)). "A dispute is genuine if the evidence could permit a

reasonable jury to reach a verdict on either side." *Aetna Cas. & Ins. Co. v. U.S.*, 685 F. Supp.

334, 336 (E.D.N.Y. 1988). Materiality, on the other hand, "runs to whether the dispute matters,

i.e., whether it concerns facts that can affect the outcome under the applicable substantive law."

---

[7] At the end of its motion for summary judgment, Local 101 also suggests that "any suit filed by the Secretary would violate Rule 11 of the Federal Rules of Civil Procedure." Def.'s Mem. of Law 11. However, Local 101 has not filed a Rule 11 motion for sanctions, and the motions before the court relate to summary judgment, which is governed by a standard with a "distinct approach[]" from the standard that governs Rule 11 motions. *Safe-Strap Co., Inc. v. Koala Corp.*, 270 F. Supp. 2d 407, 417 (S.D.N.Y. 2003). A motion for summary judgment, and not a Rule 11 motion, is the proper vehicle to "raise issues of legal sufficiency." *Id.* at 416 (quoting 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1336 (2d ed. Supp. 2003)). As a result, I do not reach this issue raised in defendant's brief.

*Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (quoting *Anderson*, 447 U.S. at 250).

The moving party bears the burden of demonstrating the absence of a genuine dispute regarding material facts. *See Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). Where, as here, both parties have moved for summary judgment, the court must examine each party's motion on its own merits and draw all inferences against the moving party. *See Morales v. Quintei Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). To overcome a motion for summary judgment, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Only when reasonable minds could not differ as to the import of the evidence before the court will summary judgment be appropriate. *Straube v. Fla. Union Free Sch. Dist.*, 801 F. Supp. 1164, 1174 (S.D.N.Y. 1992).

In this case, plaintiff's and defendant's motions for summary judgment are the "direct converse" of one another, so "a resolution of the claim resolves both [m]otions." *Acosta v. Local 872, Laborers Int'l Union of North America*, No. 2:15-cv-1079-GMN-CWH, 2017 WL 3709055, at *3 (D. Nev. Aug. 25, 2017). Specifically, the motions present the question of whether the requirement that candidates return a signed letter of acceptance—and a candidate's disqualification for failure to do so—is a "reasonable qualification uniformly imposed" under the LMRDA. Although the plain language of the LMRDA suggests that a suit brought by the Secretary of Labor under the statute can only be resolved "after a trial upon the merits," "[t]he language is not to be read literally and summary judgment lies in a proper case." *Herman v. New York Metro Area Postal Union*, 30 F. Supp. 2d 636, 642 (S.D.N.Y. 1998) (quoting *Usery v. Int'l Org. of Masters, Mates & Pilots, Int'l Maritime Div.*, 538 F.2d 946, 949 n.5 (2d Cir. 1976)).

**DISCUSSION**

## I.     The LMRDA

Section 481 of the LMRDA governs election procedures and terms of office for local and national labor organizations. It provides that "a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office." § 481(e). However, it makes an important parenthetical exception: Unions may set additional criteria for officer candidacy, as long as the additional requirements are "reasonable qualifications uniformly imposed." *Id.* The "reasonableness" of a given qualification "does not have a bright line definition," and will instead "var[y] with the circumstances." *Reich v. Local 30, Int'l Bhd. Of Teamsters*, 6. F.3d 978, 979 (3d Cir. 1993). Because the overarching goal of the LMRDA is "to conduct 'free and democratic' union elections," a given qualification's reasonableness must "be measured in terms of its consistency" with this statutory objective. *Wirtz v. Hotel, Motel and Club Emp. Union, Local 6*, 391 U.S. 492, 499 (1968).

"Congress plainly did not intend that the authorization in [§ 481(e)] of 'reasonable qualifications uniformly imposed' should be given broad reach." *Id.* At the same time, however, "[t]he LMRDA does not render unions powerless to restrict candidacies for union office." *Local 3489, United Steelworkers of America v. Usery*, 429 U.S. 305, 308 (1977). The statute strikes a careful balance between "minimal intervention" in union elections, on the one hand, and "protect[ing] the public interest by assuring that union elections would be conducted in accordance with democratic principles," on the other. *Wirtz*, 391 U.S. at 496. "One of the chief obstacles to free and democratic union elections is unduly restrictive candidacy qualifications." *Reich v. Local 1, American Postal Workers' Union*, No. 93 C 5167, 1994 WL 110610, at *5 (N.D. Ill. Mar. 31, 1994). Instead of unnecessarily reducing the candidacy pool through excessive qualifications, unions must "assume[] that the labor organization members will

exercise common sense and judgment in casting their ballots." *Martin v. Nat. Ass'n of Letter Carriers, Branch 419*, No. 3-90-371, 1991 WL 315138, at *3 (E.D. Tenn. June 24, 1991) (quoting 29 C.F.R. § 452.36(a)). In particular, "qualifications which substantially deplete the ranks of those who might run in opposition to incumbents" are especially disfavored. *Wirtz*, 391 U.S. at 499.

The Department of Labor has set forth regulations that, while "not binding" on courts, Pl.'s Mem. of Law 6–7 & n.7, may assist in the task of determining whether a given qualification is reasonable. *See* C.F.R. § 452.36. Several factors may be considered in assessing the reasonableness of a qualification, including "[t]he relationship of the qualification to the legitimate needs and interests of the union," and "the degree of difficulty in meeting a qualification by union members." *Id.* While some courts find the regulations "helpful in assessing eligibility restrictions," *Chao v. Bremerton Metal Trades Council, AFL-CIO*, 294 F.3d 1114, 1122 (9th Cir. 2002), courts must ultimately interpret "the scope of 'reasonable qualifications' narrowly so as to comport with the broader statutory scheme and purposes." *New York Metro Area Postal Union*, 30 F. Supp. at 644.

Section 482 of the LMRDA "provides the process for enforcement of a union member's charge that the union violated LMRDA § 481." *Id.* at 642–43. After exhausting internal union remedies, a union member may file a complaint with the Secretary of Labor. *Id.* at 643. If the Secretary finds probable cause that a violation of the statute occurred, the Secretary "must sue in federal court for an order annulling the challenged election and requiring a new election under the Secretary's supervision." *Id.* In bringing a case in federal court, the Secretary must show three things: (1) exhaustion of internal remedies, (2) a violation of the "reasonable qualifications uniformly imposed" requirement, and (3) "that the violation may have affected the outcome of

the election." *Id.* If the Secretary establishes proof of a violation, the burden shifts "to the defendant to show that the established violation did not affect the election results." *Chao v. Local 54, Hotel Emps. & Restaurant Emps. Int'l Union*, 166 F. Supp. 2d 109, 113 (D. N.J. 2001). A union "can rebut the presumption [that the violation may have affected the election's outcome] only with specific evidence." *New York Metro Area Postal Union*, 30 F. Supp. 2d at 644.

## II. Marquis's disqualification was a reasonable application of a facially reasonable rule.

Local 101 stipulates to the fact that Marquis exhausted all internal remedies, and does not appear to object to plaintiff's contention that Marquis's disqualification—if it constitutes a violation of the statute—"may have affected the outcome of the election." Pl.'s Mem. of Law in Further Supp. of Pl.'s Cross-Mot. for Summ. J. 2, ECF No. 21 ("Pl.'s Reply"). As a result, "[t]he court's inquiry narrows in this case" (*New York Metro Area Postal Union*, 30 F. Supp. 2d at 643) to the core issue: whether Local 101's requirement that all eligible candidates submit a signed letter of acceptance was a "reasonable qualification uniformly imposed," and, relatedly, whether the union's disqualification of Marquis for failure to comply with this rule was a reasonable application of the qualification.

### A. Facially Reasonable

The parties disagree about how to characterize plaintiff's objection to the rule and the resulting sanction imposed on Marquis. Local 101 argues that the Secretary cannot establish a violation of the LMRDA because the "Secretary cannot argue that the acce[p]tance of nomination rule was unreasonable." Def.'s Mem. of Law 9. The Secretary argues that a union may be in violation of the LMRDA if there is a sufficient showing that the *application* of a given rule—even one that is facially reasonable—was unreasonable or not uniformly imposed in a particular instance. *See* Pl.'s Reply 3–4.

In so arguing, the Secretary concedes that the letter of acceptance requirement is a facially reasonable qualification. *Id.* There is good reason for the Secretary to do so. While courts have not had the occasion to consider the reasonableness of a *pro forma* qualification exactly like the letter of acceptance rule at issue here,[8] the weight of authority suggests that a procedural requirement is reasonable if it imposes few, if any, burdens on an individual candidate and does not reduce the overall pool of eligible candidates. When analyzing the reasonableness of a qualification, courts are especially wary of qualifications that result in the *automatic* elimination of large swathes of the union's members. For example, in *Local 3489, United Steelworkers of America v. Usery*, the Supreme Court struck down a union law that made 96.5% of union members "ineligible to hold office[] because of failure to satisfy the meeting-attendance rule," leaving just 23 members who were eligible to run, "nine [of whom] were incumbent union officers." 429 U.S. at 307–08; *see also National Association of Letter Carriers, Branch 419*, 1991 WL 315138, at *3 (finding that, "as a matter of law," a union rule that "barred [union members] who have merely applied for supervisory positions from seeking union office for two years imposes an unreasonable qualification upon those who seek to qualify for union office"). These improper qualifications all resulted in the elimination of members before they were even

---

[8] The defendant cites to several cases involving similar procedural nomination requirements, including certificates of nomination, acceptance forms, and application cover sheets, that arose in the context of *public*, rather than union, elections. Def.'s Mem. of Law 10–11; *see, e.g. Friedman v. Abrams*, 600 F. Supp. 596, 596, 597–98 (S.D.N.Y. 1985) (upholding the disqualification of a candidate for civil court judge in the Bronx for failure to "state the name and residence of the nominee" on a required form, in part because the candidate did not allege that compliance with the procedural requirement "in the first instance is complex, difficult, or burdensome in any way"); *Hutson v. Bass*, 426 N.E.2d 749, 750 (N.Y. 1981) (finding that "the undisputed fact that the cover sheets for the designating petitions of candidates for election as judicial delegates were not filed within the time prescribed by the statute, although late by only 15 minutes, was a fatal defect"). Though union elections, as prescribed by the LMRDA, may be "modeled on 'political elections in this country,'" both parties acknowledge that these cases implicate the First Amendment, rather than the meaning of "reasonable qualifications" under the LMRDA. Def.'s Mem. of Law 10; Pl.'s Mem. of Law 14–15. Moreover, Local 101's reliance on these cases is unnecessary, as the Secretary acknowledges that the rule is facially reasonable and the case law supports this conclusion.

able to express an interest in running, imposing substantive rather than purely procedural obstacles on candidacy that were sometimes impossible to obey. *Cf. Local 3489, United Steelworkers of America* at 310–11 (noting that a meeting attendance requirement that effectively "require[d] a member [to] decide upon a potential candidacy at least 18 months in advance of an election when no issues exist to prompt that decision" is likely to have a "restrictive effect on union democracy" by paralyzing any opposition movements).

In contrast, the letter of acceptance submission requirement, on its own, does not result in the disqualification of any candidate for office. *See Brennan v. Local 5724, United Steelworkers of America*, 489 F.2d 884, 889 (6th Cir. 1973). Any interested member can comply with this requirement "by the relatively unburdensome step" of hand-delivering a signed letter to the union office. *Id.* The requirement that candidates submit a signed letter of acceptance does not fall more heavily upon challengers, who "ha[ve] the same opportunities and the same rules applicable to them as the other candidates." *Patterson v. United Mine Workers of America*, No. 77-0606, 1977 WL 1653, at *3 (D.D.C. Apr. 29, 1977). Like the requirement in *Patterson* that candidates wishing to join with others form a complete slate of fourteen nominees, the requirement that candidates return a signed letter of acceptance form applies to all union members, and there is no argument that Local 101 has "denied or frustrated [Marquis's] efforts" to comply with the generally-applicable rule. *Id.* at *2.

### B. Reasonable as Applied

Though the Secretary does not have a claim that the qualification is unreasonable on its face, he is correct that the LMRDA theoretically authorizes a challenge where an otherwise reasonable rule is unreasonable in its application. To the extent that the union denies that such an argument is ever authorized by the statute, it is wrong. *See* Def.'s Reply Mem. of Law in Further

Supp. of Def.'s Mot. for Summ. J. and in Opp'n to Pl.'s Mot. for Summ. J. 3, ECF No. 19

("Def.'s Reply"); *see also Reich v. Local 89, Laborers' Int'l Union of North America*, 36 F.3d

1470, 1477 (9th Cir. 1994) ("While a particular procedure may not on its face violate the

requirements of the [LMRDA], its application in a given instance may make nomination so

difficult as to deny the members a reasonable opportunity.") (quoting 29 C.F.R. § 452.57).

However, I agree with Local 101 that, under the facts of this case, the Secretary cannot

sustain an argument that the letter of acceptance rule is unreasonable as applied to Marquis. The

Secretary makes two primary arguments regarding the application of the letter of acceptance

rule: (1) Marquis's disqualification was unreasonable because it "served no important union

purpose nor was it related to the qualifications to serve as union [p]resident," and (2) the decision

to disqualify Marquis, rather than impose some other unspecified sanction or pursue alternative

channels to ensure his compliance with the rule, was unreasonable because the committee was

"well aware of [his] strong desire to run." Pl.'s Mem. of Law 9, 10. Neither argument is

convincing.

First, the Secretary makes too much of the fact that Local 101 does not disclose a specific

purpose for either the acceptance form requirement or the decision to disqualify Marquis. Pl.'s

Mem. of Law 10. As the Secretary admits, courts are not obligated to consider the purpose or

interest advanced by a given qualification. *Id.* at 7 n.1. Instead, courts have found that the

union's interest in setting a specific qualification is relevant where a valid and significant interest

is "the only way to justify a requirement that has a large antidemocratic effect." *Doyle v. Brock*,

821 F.2d 778, 785 (D.C. Cir. 1987). As already discussed, there is nothing inherently

antidemocratic about the rule at issue here; it does not fall disproportionately on challengers, and

it is not particularly burdensome or complex. Furthermore, in focusing on the purpose behind the

acceptance form and the decision to disqualify Marquis, the Secretary revives arguments that he has already conceded; the purpose of a qualification can be relevant to determining whether it is facially reasonable, but the Secretary already admits that the acceptance form requirement here is facially reasonable. *See, e.g.*, Pl.'s Mem. of Law 10 ("Defendant derailed Complainant's candidacy over a procedural rule that served no purpose but to confirm his well-known intention to run."). To the extent that the Secretary argues that the *sanction* of disqualification served no purpose, he provides no support for the contention that the purpose of a penalty is a relevant inquiry in the analysis of a reasonable qualification.

Likewise, the Secretary cites no authority to support the argument that a sanction may be unreasonable as applied to a particular person when the rule that led to the sanction was itself reasonable. Instead, the cases upon which the Secretary relies recognize a claim based on the unreasonable application of a rule where a rule's procedural implementation and application to an entire *election*, as opposed to a specific person or candidate, was unreasonable. In *Herman v. New York Metro Area Postal Union*, the court struck down the application of a rule that required candidates to provide their social security numbers and addresses by a specific deadline. The court found that the "challenge [was] not to the deadline itself, but to the application of the deadline, which amounts to a claim that Metro impermissibly applied a requirement that otherwise could be facially valid." 30 F. Supp. 2d at 645. The problem was not that the union required candidates to disclose certain personal information by a deadline, but rather that the deadline was "not adequately disclosed" to prospective candidates. *Id.* Because prospective candidates did not have sufficient notice of the deadline, it was unreasonable to disqualify those who failed to comply. *Id.* Similarly, in *Reich v. Local 1, American Postal Workers' Union*— another case upon which the Secretary relies—the court found that a meeting attendance rule that

"precluded over ninety percent of union members from seeking office" was unreasonable in its application because it was "enacted less than a month before the election." No. 93 C 5167, 1994 WL 110610, at *5 (N.D. Ill. Mar. 31, 1994). Those who did not meet the attendance criteria had no way to cure the defect because the rule's announcement came too late. *Id.*

In both of these cases, the union's violation rendered a rule unreasonable as applied to an entire election; the rule's unreasonableness did not depend on the circumstances of an individual candidate's communication with the union. Because the unions failed to provide advanced notice of the rules to all members,[9] the rules could not have been reasonable as applied to *any* candidate for office during that election year. In essence, the particular qualifications challenged in *Local 1, American Postal Workers' Union* and *New York Metro Area Postal Union* were unreasonable immediately upon their announcement; the determination of their validity under the statute was not contingent on the particular candidate who would later fail to comply with the rule.

In contrast, the Secretary argues that the union's decision to disqualify Marquis was unreasonable because of something unique to Marquis himself. He argues that it was unreasonable for Local 101 to disqualify Marquis not because Marquis and other candidates were unable to comply with the acceptance letter rule, but rather because the union "was well aware of [Marquis's] strong desire to run." Pl.'s Mem. of Law 10. The Secretary notes that Marquis had "repeatedly demonstrated his clear intent to run . . . throughout the election by personally picking up the petition, by personally collecting the requisite number of signatures, by

---

[9] Local 101 highlights the fact that Marquis had ample notice of the application rule in this case—unlike the union members in *Local 1, American Postal Workers' Union* and *New York Metro Area Postal Union*. Def.'s Reply 3. In response, the Secretary argues that the presence or absence of notice is "a distinction without a difference." Pl.'s Reply 4. Though notice itself does not distinguish the cases, the fact that there were no procedural defects in the implementation of the acceptance form rule in Local 101's 2017 election that would apply globally to all candidates—and not just to Marquis—is an important distinguishing feature between the factual circumstances of these cases.

personally returning the completed petitions, and ultimately (albeit belatedly) by returning the *pro forma* letter." *Id.* 8, 9. Yet the rule urged by the Secretary—that an otherwise reasonable qualification can be unreasonable as applied to a particular *person* based on the facts and circumstances of that person's interaction with the union—is simply not recognized in the case law.

Furthermore, and perhaps even more importantly, the rule urged by the Secretary would run directly afoul of the union's obligation to ensure that qualifications are not just reasonable, but also "uniformly imposed." 29 U.S.C. § 481(e). As Local 101 notes, the Secretary argues that "because the [e]lection [c]ommittee 'knew' that Mr. Marquis had a 'clear intention' to run, it should have waived an express provision of the [e]lection [r]ules." Def.'s Mem. of Law 11. However, the LMRDA forbids this exact type of discretionary behavior; where the application of a rule depends on the whims or instincts of a given election official, it is per se unreasonable. *See, e.g. Local 872, Laborers Int'l Union of North America*, 2017 WL 3709055, at *4 (striking down the use of a literacy test as an election qualification where the election official administered the literacy test to only one candidate for office, "claiming that he was aware the other candidates were literate from knowing them personally"). Instead, qualifications must be imposed using "objective measure[s]" and criteria to ensure fairness in the election process. *Id.*

If the Secretary's argument succeeded, Local 101 would be free to disregard the application form rule if it was satisfied that a candidate had sufficiently publicized his intentions to run for office. But this is a recipe for the non-uniform imposition of a qualification. "The Department of Labor's [r]egulations expressly distinguish between reasonable qualifications capable of uniform application and qualifications which permit subjective determinations of eligibility." *Donovan v. CSEA Local Union 1000, American Fed'n of State*, 761 F.2d 870, 875

(2d Cir. 1985). The use of "vague and subjective criteria" in the union election process "is a deterrent to potential candidates and inhibits members from exercising their union judgment." *Id.* (striking down a rule where one part of the nomination process allowed a committee to choose candidates for office without any guiding principles or objective criteria). Here, the union required all candidates to submit their acceptance forms by the same deadline; if it had made an exception for Marquis while demanding that the incumbents, including Bradley, obey the rule, it would have likely violated the statute.

Exceptions to generally-applicable qualifications are only appropriate where they are categorical in nature, and can thus be uniformly applied. *See, e.g. Brock v. Int'l Org. of Masters, Mates & Pilots*, 842 F.2d 70, 73 (4th Cir. 1988) (holding that a 72-hour grace period for the deadline of union dues for "members on a foreign voyage" was justified since it was categorically applied to all union members in the same, easily-verifiable circumstance). In contrast, a rule that would authorize deviation from a qualification based on the subjective beliefs or awareness of union officials would violate the "uniform" requirement of the statute. The Secretary provides no additional explanation about how its proposed alternative rule— making an exception to the acceptance form deadline for certain individuals—could apply in a uniform way to comply with the LMRDA.

### III. Any other alleged violations are irrelevant to the question presented here.

Finally, the Secretary argues that Local 101 inconsistently applied several of its election rules throughout the 2017 election, and that these inconsistencies "violate[] section 4[8]1(e)'s requirement that qualifications for union office be 'uniformly imposed' and undercut[] [Local 101's] defense." Pl.'s Reply 1. Ultimately, while these allegations are troubling, I agree with Local 101 that they are "irrelevant" to the question presented here. Def.'s Reply 4. While an

allegation that the union inconsistently applied the acceptance form requirement itself would be relevant to this case, the Secretary focuses primarily on violations of entirely different rules that had no bearing on the outcome of this election, and that played no role in disqualifying Marquis as a candidate for office. *Cf. Hugler v. Local 689, Amalgamated Transit Union*, 266 F. Supp. 3d 855, 862 (D. Md. 2017) (finding that the union was inconsistent in its application of one particular rule where "some members were permitted to regain good standing by entering . . . alternative payment plans, [and] some were not").

The Secretary highlights the following violations: (1) Local 101's bylaws state that elections are to be held "in the first two weeks in December," but the election in 2017 was actually scheduled for March;[10] (2) there is no specific authorization in the bylaws or elsewhere for Local 101 to conduct an election by acclamation prior to the date set for a contested election; and (3) incumbent candidates received their acceptance forms by hand, rather than by mail, as explicitly demanded in the election rules. Pl.'s Mem. of Law 12–13. The Secretary argues that these rule inconsistencies all favored incumbents, to the disadvantage of challengers. Pl.'s Reply 6. However, it is notable that in at least one instance, Local 101 bent the rules to benefit Marquis—suggesting that these inconsistencies were not entirely one-sided. *See* Stip. of Facts ¶ 22 ("The Committee did not discount signatures [Marquis had] gathered before February 6, 2017.)."

More fundamentally, the Secretary cannot state a claim that Local 101 violated the LMRDA simply by failing to comply with its own rules. While "[a]n allegation that a union violated its constitution and bylaws would state a claim under § 411(a)(1) 'when the variance or

---

[10] Local 101 argues, in a disputed "supplemental facts" section, that the union has held all elections in March since 1992, when a previous federal case overturned the union's 1990 officer election. Def.'s Reply 2. Because the date of the election is not material to the facts of this case or to the ultimate legal conclusion, I do not address the parties' disputes over the inclusion of these facts or their accuracy.

irregularity results in discriminatory deprivation of an individual's right to cast a meaningful vote,'" the statute does not "grant federal courts 'jurisdiction to enforce union constitutions and bylaws.'" *Conway*, 2001 WL 1867701, at *8 (quoting *Neinaber*, 652 F.2d at 1286). The Secretary has not alleged that the date of the election deprived Marquis of the right to vote or participate in the election; instead, the Secretary's claim "is merely an allegation that the [u]nion violated its own rules." *Sheen v. Screen Actors Guild*, No. CV 12-01468 SJO (AJWx), 2012 WL 2360923, at *6 (C.D. Cal. Mar. 28, 2012). Neither the date on which the contested election was scheduled or the date on which the election by acclamation eventually took place singled out Marquis's right to vote or otherwise discriminated against him.

Though the date of the election is entirely immaterial to the specific violation alleged here, the fact that the incumbents received their letters of acceptance by hand rather than mail is more concerning. The Secretary argues that "[t]his inconsistent application of the rules . . . favored the incumbent candidates." Pl.'s Mem. of Law 13. I agree that it is possible that hand-delivery of the acceptance letters may have made it easier—or more likely—for the incumbent candidates to comply with the return deadline. Still, the Secretary does not argue that Marquis was *less able* to comply with the return deadline as a result of the slight advantage his opponent received. Marquis received his letter in the mail on February 17, and did not have to return it until February 22—a full five days later. There are no allegations in the record that Marquis was out of town or otherwise unable to comply with this reasonable qualification during the time allotted.

Moreover, to the extent that the Secretary implicitly argues that the manner in which the letter of acceptance is delivered to a candidate is itself part of the "qualification" imposed by the rule, the Secretary has not demonstrated that the manner of delivery had any potential effect on

the outcome of the election. Though hand-delivery may have improved the chances that Bradley would comply with the form requirement, it did not make it any more difficult for Marquis to comply. *Cf. Usery v. Local Union No. 639 Int'l Bhd of Teamsters*, 543 F.2d 369, 381 (D.C. Cir. 1976) ("The occurrence of employer assistance to incumbents in the course of a government-supervised election is indeed troubling, but we cannot say that the Secretary acted without rational basis in concluding there was no probable effect on the outcome."). As a result, the Secretary could not meet the requirement of showing that this violation had any potential impact on the election—a necessary prerequisite for a claim under § 481(e). *See New York Metro Area Postal Union*, 30 F. Supp. 2d at 642–43. Thus, while Local 101 should take care to ensure that all rules are consistently applied in the future, its failure to do so in the 2017 election does not change the fact that the letter of acceptance rule was a reasonable qualification uniformly imposed. *See Herman v. Local 50, Service Emps. Int'l Union*, 211 F. Supp. 2d 1111, 1119 (E.D. Mo. 2001) (noting that, though the union member "was not harmed" by the challenged rule, the union should ensure that its rules are "evenly applied" in "any future elections").

## CONCLUSION

For the foregoing reasons, Local 101's motion for summary judgment is granted, and plaintiff's cross-motion for summary judgment is denied.

So ordered.


\_\_\_\_\_/s/_____
Allyne R. Ross
United States District Judge


Dated:          September 10, 2018
                Brooklyn, New York